FARMERS & MERCHANTS NATIONAL BANK, a National Banking Institution Organized Under the Laws of the United States of America, Plaintiff,

v.

SAN CLEMENTE FINANCIAL GROUP SECURITIES, INC., Defendant.

Civil Action No. 95–4411(JBS).

United States District Court, D. New Jersey.

June 25, 1997.

E. Powell Miller, Mantese, Miller and Mantese, P.L.L.C., Troy, MI, Robert J. Pryor, Bridgeton, NJ, for Plaintiff.

Victor A. Deutsch, Deutsch & Falk, P.C., Woodbridge, NJ, for Defendant.

SIMANDLE, District Judge:

Presently before the court in this case are plaintiff's motion for summary judgment on defendant's counterclaim; defendant's motion to dismiss plaintiff's RICO claims, set forth in Count Four of plaintiff's Amended Complaint; and two motions, pursuant to General Rule 40D recodified as L. Civ. R. 72.1(c)(1) (eff. Apr. 1, 1997), which seek to appeal certain discovery orders entered by Magistrate Judge Rosen, on December 20, 1996, and January 23, 1997. The principal issues discussed are: (1) whether documents signed by a low-level bank officer called "funds letters" quoting rates of interest payable upon multi-million dollar certificates of deposit constitute enforceable contracts entered into by a bank employee alleged to have apparent authority (Part II.A); (2) whether the sale of a federally-insured certificate of deposit constitutes a "fraud in the purchase or sale of securities" which is exempted from the coverage of RICO by operation of the Private Securities Litigation Reform Act of 1995 (Part II.B.3); (4) whether the magistrate judge's denial of discovery of defendant's federal income tax returns was an abuse of discretion (Part III.C.1); and (5) whether the magistrate judge's limitation upon the scope of discovery of defendant's "funds letters" involving other customers was clearly erroneous or contrary to law. (Part III.C.2). For the reasons expressed below, all motions presently before the court will be denied, with the exception of defendant's motion to dismiss plaintiff's RICO claims which is granted in part and denied in part.

## I. *Background*

Plaintiff Farmers & Merchants National Bank ("F & M Bank") is a rural bank which does business primarily in Cumberland, Salem and Gloucester counties in southern New Jersey. (Wolf Aff. ¶ 3). Defendant San Clemente Financial Group Securities, Inc. ("San Clemente") is an NASD broker-dealer, whose business includes the placement of brokered certificates of deposit. (Christopher Aff. ¶ 2).

On April 10, 1995, and April 13, 1995, a series of faxes were passed between San Clemente employee Christopher Dobson and David Loveland, who at the time was an Assistant Vice President and functioned as the "deposit teller" for the main branch of F & M Bank. (Wolf Aff. at ¶ 13). Dobson inquired as to certificate of deposit rates for deposits up to $5,000,000, and negotiated with Loveland about the rates. Dobson faxed a "funds letter" dated April 10, 1995, drafted by San Clemente, which Loveland signed and returned at Dobson's request. (Loveland Aff. ¶ 7). That document reads as follows:

> Farmers and Merchants National Bank agrees to issue one FDIC insured CD for a total face value of up to $5,000,000, at a 7.25 coupon, paying semi-annually. This CD will be set up at a price of 100.0 Invested principal will be $5,000,000. This CD is DTC eligible and will settle no later than 4/18/95 and mature on 10/18/96. This CD is not eligible for early withdrawal.

(Pl. Br. ex. 2).

On April 13, 1995, Loveland signed a second funds letter with similar terms and returned it to Dobson via facsimile. (Pl. Br. ex 3). That document states:

> Farmers and Merchants National Bank agrees to issue one FDIC insured zero coupon CD for a total face value of up to $5,000,000. This CD will be set up at a price of 89.125. Invested principal will be $4,456,250. This CD is DTC eligible and will settle no later than 4/21/95 and mature on 11/11/96. This CD is not eligible for early withdrawal.

Loveland claims that when he signed the two letters, he believed he was giving price quotes only, and that he was not binding the Bank to accept monies in any minimum amount in exchange for a certificate of deposit. (Loveland Aff. ¶ 9).

The parties present conflicting evidence as to whether Dobson told Loveland that he was a broker seeking to make a brokered funds transaction. (Dobson Dep.I at 54:10–12; Loveland Aff. at ¶ 4). F & M Bank asserts that it has never accepted brokered funds for certificates of deposit and in fact has a written Policy Statement dated February 23, 1995, which expresses that it is against bank policy to accept brokered funds. (Wolf Aff. at ¶¶ 4, 6; Pl. Br. ex 1).

San Clemente argues that the two funds letters obligated F & M Bank to issue two CDs at negotiated and agreed interest rates. San Clemente further claims that on April 18, 1995, F & M Bank breached its contracts with San Clemente by refusing to accept funds in exchange for a certificate of deposit. F & M Bank, through its Executive Vice–President, Robert C. Wolf, attests that it did not accept monies from San Clemente because the documents signed by Mr. Loveland were price quotes only for certificates of deposit and did not require the Bank to establish any certificates of deposit in a minimum amount; and because David Loveland did not have the authority of the Bank to enter into a transaction involving the use of brokered funds. (Wolf Aff. at ¶ 8).

Plaintiff brought suit seeking a declaratory judgment that the documents at issue do not constitute contracts which are enforceable against F & M Bank, and seeking damages from San Clemente for unethical business practices, common law fraud, and violation of the civil RICO statute. San Clemente filed a counterclaim against F & M Bank seeking damages for F & M Bank's refusal to set up certificates of deposit for brokered funds.

## II. *Discussion*

### A. *Plaintiff's Motion for Summary Judgment*

#### 1. *Summary Judgment Standard*

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding whether there is a disputed issue of material fact the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080–81 (3d Cir. 1996); *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that: "[w]hen the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329–30 (3d Cir.1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). However, "the nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial." *Brewer*, 72 F.3d at 330 (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### 2. *Analysis*

Pivotal to the dispute between the parties is the determination of whether the funds letters faxed between Christopher Dobson and David Loveland constitute enforceable contracts. Plaintiff argues that they do not, for three reasons: 1) the funds letters were merely price quotes, not contracts; 2) the funds letters are unenforceable as contracts because they contain an indefinite quantity term and an illusory promise; 3) David Loveland lacked the actual or apparent authority to bind F & M Bank to a contract for brokered funds. The court will address each argument in turn.

### a. *Plaintiff's Argument that the Funds Letters Constitute Price Quotes*

Plaintiff contends that the documents signed by David Loveland on April 10 and 13, 1995, were merely price quotes and did not purport to agree to set up a certificate of deposit in a minimum amount. For this argument, plaintiff relies on the affidavit of David Loveland, in which Loveland states, ". . . I believed that I was quoting certificate of deposit rates for informational purposes only. F & M Bank could then decide whether to accept money from San Clemente in return for a certificate of deposit at the time San Clemente actually brought its money to F & M Bank." (Loveland Aff. ¶ 9).

Defendant responds by pointing to Loveland's deposition testimony in which Loveland testifies that he negotiated CD rates with Dobson. (Loveland Dep. at 49:14–50:10). From this testimony, defendant concludes, "Clearly, Loveland negotiated the rates for both CDs. He did not merely quote rates. His Affidavit testimony is false." (Def. Br. at 13).

Whether Loveland's testimony is false is immaterial for purposes of this summary judgment motion. It is not inconsistent for Loveland to have negotiated a rate and then to have quoted that negotiated rate without intending to form a contract. The real issue, however, is whether Loveland intended to enter into a contract with San Clemente or to merely quote negotiated CD rates.

Loveland's subjective intent, as expressed in his affidavit, is not sufficient to establish his lack of intent to enter into a contract. "Contract construction is directed at discovering the objective intent of the parties manifested in the terms of the agreement, not the undisclosed, subjective intent

of one party or another." *Petroleo Brasileiro v. Nalco Chemical Co.*, 784 F.Supp. 160, 166 (D.N.J.1992) (internal quotations and citation omitted). Thus, summary judgment cannot be granted in favor of F & M Bank as a matter of law based on the representations of Loveland that he did not intend to enter a contract because there is a material factual dispute regarding the objective intent of the parties.

The court will now turn to plaintiff's argument which addresses the actual language of the contract.

b. *Plaintiff's Argument that the Funds Letters are Illusory or Indefinite*

■ Plaintiff argues that the funds letters are unenforceable as contracts because they contain an indefinite quantity term. As noted above, the April 10, 1995 funds letter states:

> Farmers and Merchants National Bank agrees to issue one FDIC insured CD for a total face value of **up to** $5,000,000, at a 7.25 coupon, paying semi-annually. This CD will be set up at a price of 100.0 Invested principal will be $5,000,000. This CD is DTC eligible and will settle no later than 4/18/95 and mature on 10/18/96. This CD is not eligible for early withdrawal. (emphasis added).

Specifically, plaintiff contends that the use of the term "up to" in describing the face value of the CDs renders the contracts too vague and ambiguous to be enforced.

In construing the purported contract, however, the court finds that its terms are not ambiguous. The funds letter contains explicit provisions that F & M Bank "agrees to issue one FDIC insured CD" and that "invested principal will be $5,000,000." A reasonable construction of the document indicates that there was an agreement that F & M Bank would accept the amount tendered by San Clemente up to $5,000,000, at a given rate, for a specified time. That $5,000,000 would in fact be the amount of the invested principal is made clear by the very same paragraph.

The court disagrees with plaintiff's interpretation of the agreement as meaning that F & M Bank could decide how much it wants to accept from San Clemente, from $0 to $5,000,000. Surely, F & M Bank would not have accepted a tender of $1 for the same rates negotiated for a $5,000,000 CD. Even construing the document against its drafter, San Clemente, it is reasonable to read the funds letter as giving San Clemente the option to deliver up to $5,000,000 in funds in exchange for a CD at a negotiated rate.

Likewise, plaintiff's argument that the promises contained in the funds letters are illusory must fail. The terms of the agreement do not indicate that F & M Bank had no obligation to set up a CD in a minimum amount. The court will not construe the document to contain a promise that F & M Bank could accept an amount of $0 from San Clemente, for such a construction is both illogical and inconsistent with the explicit $5,000,000 provision for total invested principal in this agreement.

Thus, summary judgment will not be granted in favor of plaintiff on the grounds that the terms of the funds letters are indefinite or illusory. The court now turns to the issue of whether the agreement between F & M Bank and San Clemente was otherwise enforceable.

c. *Plaintiff's Argument that David Loveland Lacked Actual or Apparent Authority*

i. *Actual Authority*

■ Plaintiff argues that the agreements between F & M Bank and San Clemente are unenforceable because David Loveland, the assistant vice president of F & M Bank, did not have actual authority to enter into a transaction involving brokered funds. The court agrees Loveland lacked actual authority, as a matter of law.

F & M Bank's written Policy Statement, dated February 23, 1995, clearly states:

> Only in extreme emergency and only with prior board of director's approval, will this bank use brokered funds. Stated differently, it is against bank policy to use brokered funds, and only under extreme circumstances would the board change this policy.

(Pl. Br. ex. 1).

David Loveland, as an assistant vice-president of the bank, with no policy-making au-

thority, could not act contrary to the policy of the bank, and thus did not have the actual authority to agree to issue a CD in exchange for brokered funds. (Wolf Aff. ¶¶ 8(b), 14).

### ii. *Apparent Authority*

■ Finally, plaintiff argues that Loveland also lacked apparent authority to bind F & M Bank. "[A]pparent authority by which a principal is bound is only that which 'a person of ordinary prudence' is justified in presuming from the conduct of the principal. Such authority is not expanded by the carelessness and indifference of the third party nor erected upon the misrepresentations of the agent." *Wilzig v. Sisselman,* 209 N.J.Super. 25, 35, 506 A.2d 1238 (App.Div.1986) (citing *Mesce v. Automobile Ass'n of New Jersey,* 8 N.J.Super. 130, 136, 73 A.2d 586 (App.Div. 1950). In applying the doctrine of apparent authority, the court must look to any representations by the principal, F & M Bank, and whether there was justified reliance on those representations by the third party, San Clemente.

■ Plaintiff argues that F & M Bank did not make any representations to San Clemente concerning Loveland's authority. Plaintiff also asserts that the words or conduct of Loveland, as the agent, are insufficient to bind F & M Bank. Specifically, plaintiff claims that it is irrelevant to the apparent authority inquiry that Loveland may have told Dobson that he was authorized to do this type of transaction (Dobson Dep.I 54:6–9), or that he signed the funds letters, which contained the language "I am authorized to sign this agreement." Plaintiff is correct in arguing that apparent authority cannot be based upon the representations of an agent. *Wilzig,* 209 N.J.Super. at 36, 506 A.2d 1238.

■ Defendant, however, argues that Loveland had apparent authority to enter into a contract with San Clemente because F & M Bank held him out as an officer of the bank who had authority to negotiate CD rates. A Statement of Condition prepared by F & M Bank, and provided to San Clemente by Loveland at Dobson's request, indicated that Loveland was an assistant vice president. (Pl. Br. ex 21). When Dobson called the bank and asked for the person authorized to negotiate CD rates, he was put in touch with Loveland. (Dobson Dep.II at

19). Further, defendant has submitted evidence that suggests F & M Bank gave Loveland authority to negotiate rates for certificates of deposit that sometimes reached amounts of millions of dollars, and to provide special rates without seeking permission of any superior officer at F & M Bank. (Loveland Dep.I at 44–48). Although there was a bank policy against issuing CDs for brokered funds, Loveland was not given a copy of this written policy. (Poloff Dep. at 109:11–15). The bank's procedures concerning CDs changed after F & M Bank had problems concerning the transactions with San Clemente. From that point on, Loveland was required to check with a superior before quoting rates that were anything but standard rates. (Loveland Dep. at 75–76).

From this evidence, defendant concludes that Loveland had the power to negotiate interest rates and enter into CD commitments on behalf of the bank and that San Clemente relied upon that power in attempting to place brokered funds with F & M Bank.

Plaintiff has set forth a significant amount of evidence which suggests, among other things, that Dobson knew that many banks had policies against using brokered funds (Dobson Dep.I 55:3–6); that San Clemente was told, prior to April 10, 1995, that F & M Bank does not deal in brokered funds (Poloff Dep. at 101); that Dobson knew an assistant vice president was the lowest level of the management structure (Dobson Dep.II at 33–34); that the transaction between Dobson and Loveland took place by fax, in a single day, without a notarized signature or board approval; and that such circumstances are contrary to custom and trade, according to plaintiff's expert, Dr. Austin.

The evidence supporting Loveland's lack of apparent authority is indeed weighty. "Despite a wide discrepancy between the relative amount of the evidence presented, a court's role at the summary judgment stage is merely to identify factual issues, not to weigh the credibility or strength of the evidence. That task must be left to the jury." *California Natural, Inc. v. Nestle Holdings, Inc.,* 631 F.Supp. 465 (D.N.J.1986). In this case, the court finds that a genuine issue of material

fact exists as to whether F & M Bank placed David Loveland in a position such that "a person of ordinary prudence, conversant with business uses, and the nature of the particular business, is justified in presuming that such agent has the authority to perform the particular act in question." *Alicea v. NTS,* 244 N.J.Super. 119, 128–29, 581 A.2d 900 (App.Div.1990). Further, given the antipathy of banks against accepting brokered funds for CDs, defendant's claim of reasonable reliance upon Loveland's apparent authority without having made explicit inquiry rests on particularly shaky grounds. The question of whether San Clemente reasonably relied on the words or conduct of F & M Bank with regard to Loveland's authority is a question for the jury, which precludes summary judgment at this time.

For the reasons expressed above, plaintiff's motion for summary judgment on defendant's counterclaim will be denied.

**B.** *Defendant's Motion to Dismiss Plaintiff's RICO Claims*

**1.** *Motion to Dismiss Standard*

The court may not grant a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Moreover, when reviewing the motion, the district court must accept as true the facts pleaded in the complaint and any and all reasonable inferences derived from those facts. *See Unger v. National Residents Matching Program,* 928 F.2d 1392, 1400 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). *See also Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686 (stating that allegations of a complaint should be favorably construed for the pleader).

■ It is not necessary for the plaintiff to plead evidence, nor must he plead the facts that serve as the basis for the claim. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *In re*

*Midlantic Corp. Shareholder Litigation,* 758 F.Supp. 226, 230 (D.N.J.1990). The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether he can prove any set of facts in support of his claim that would entitle him to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984).

**2.** *Whether the "funds letters" constitute "securities"*

Count four of plaintiff's Amended Complaint alleges that defendant San Clemente has violated the RICO statute, 18 U.S.C. § 1962, by engaging in a continuous, ongoing and extended scheme to defraud banks and other institutions through a pattern of racketeering activity.

■ San Clemente urges the court to dismiss plaintiff's RICO claim on the basis that plaintiff's claims are based on allegations of securities fraud, which is not a permissible predicate offense pursuant to 18 U.S.C. § 1964(c), as amended by the Private Securities Litigation Reform Act on December 22, 1995, at § 107 of Pub.L. 104–67, 109 stat. 758. The 1995 amendment precludes a civil remedy for RICO violations based on securities fraud by adding the language, ". . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962." 18 U.S.C.A. § 1964(c) (1996). Specifically, defendant claims that the alleged agreements between the parties for the issuance of certificates of deposit were agreements for the sale of securities. Further, defendant argues that "the entirety of the wire and mail fraud allegations by Farmers concern the sale of securities by San Clemente to others." (Def. Br. at 4). If defendant is correct, plaintiff's RICO action would be barred under the 1995 amendment to § 1964(c), *supra,* as conduct actionable as fraud in the purchase or sale of securities.

It is well established that certificates of deposit issued by federally-insured banks for currency are not "securities" within the meaning of the various federal statutes regulating securities. *See Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d

409 (1982); *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985); *Tafflin v. Levitt,* 865 F.2d 595, 598 (4th Cir.1989). The Reform Act's deletion of securities fraud thus deletes nothing of relevance to plaintiff's claim that the defendant's fraud consists of the defendant's dealings with the bank in procuring certificates of deposit. Moreover, the "funds letters" are also not securities; even if one assumes for argument's sake that such a fund letter is an investment contract, an investment contract is not a security under the Securities Exchange Act unless it is an instrument that meets the three-pronged test of *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946):(1) there is an investment of money, (2) in a common enterprise, and (3) with the expectation of profits produced solely by the efforts of others. There was no actual "investment of money" in this case, nor was the plaintiff involved with San Clemente in a common enterprise of raising funds for San Clemente's purchase of the CD's; moreover, any profit to plaintiff would have come from its own efforts, not those of others. Further, federally insured CD's would appear to fit the definition of a "nonsecurity" under *Reves v. Ernst & Young,* 494 U.S. 56, 69, 110 S.Ct. 945, 953, 108 L.Ed.2d 47 (1990), because the CD's are already subject to substantial regulation under the federal banking laws, *citing Marine Bank, supra,* 455 U.S. at 557–58, 102 S.Ct. at 1224–25.

Therefore, this court agrees with plaintiff's argument that its RICO claims do not arise out of the purchase or sale of a security. Instead, F & M Bank claims that its RICO claims are based on the unethical and fraudulent conduct of defendant in inducing persons from banks throughout the country to sign "fund letters," which are then used to extort money from those banks. Plaintiff claims that there are other victims of San Clemente's conduct, including Sterling Bank & Trust in Michigan, who had a similar experience with San Clemente, and possibly others. (RICO Case Statement ¶ 3). "Racketeering activity" under 18 U.S.C. § 1961(1) includes mail fraud (§ 1341), wire fraud (§ 1343), and bank fraud (§ 1344).

Plaintiff further alleges that the fund letters used by defendant do not constitute enforceable contracts and so the transactions initiated by San Clemente could not advance to the point of the purchase or sale of certificates of deposit. Accepting this as true, the conduct asserted to be the basis of plaintiff's RICO claim is not securities fraud, as defendant contends, but rather the fraud perpetrated by San Clemente in inducing low-level bank employees to enter multi-million dollar transactions, despite knowledge that these employees are without authority to enter agreements on behalf of banks.

### 3. *Whether plaintiff states a RICO claim under 18 U.S.C. §§ 1962(a), (b), or (c)*

Plaintiff's RICO Case Statement, filed August 30, 1996, provides the specific content of the RICO allegations of Count Four. Plaintiff alleges that defendant's conduct violates 18 U.S.C. §§ 1962(a), (b) and (c), for "a pattern of racketeering activity of fraudulently inducing bank employees to sign alleged 'agreements'", where the agreements purport to bind the banks to issue CD's in exchange for brokered funds. (RICO Case Statement ¶¶ 1 & 2.) Upon obtaining the signatures of low-level unauthorized employees, the pattern of defendant is to allegedly extort the bank's money by threatening litigation in California. (*Id.* ¶¶ 4 & 5.) Other victim banks are identified or alleged. (*Id.*) The relationship between the defendant and the racketeering enterprise is murky; the defendant is part of the enterprise, as is a prior, related entity, San Clemente Financial Group, Inc. (*Id.* ¶ 6.) The enterprise is alleged to have employees, and to derive money from the alleged pattern of racketeering activity. (*Id.* ¶ 12.) The damage to plaintiff's property is alleged to arise from disruption of plaintiff's banking activities, loss of management time, and attorney's fees expended to try to stop the defendant's activities. (*Id.* ¶¶ 14–16.)

The requirements for pleading a RICO cause of action under §§ 1962(a), (b) and (c) are gradually becoming well settled. The civil cause of action on behalf of a party claiming to be harmed by the racketeering activities of an enterprise which violates § 1962 is provided by 18 U.S.C. § 1964(c):

Any person injured in his business or property by reason of a violation of Section

1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as a fraud in the purchase or sale of securities to establish a violation of section 1962. A RICO plaintiff under § 1964(c) must allege that a defendant's violation of § 1962 is the proximate cause of plaintiff's alleged injuries, which means "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). Certainly a banking institution can be a RICO victim, as opposed to its depositors generally, when the institution is defrauded in connection with the sale of certificates of deposit, *see In re Sunrise Securities Litigation*, 916 F.2d 874, 887–88 (3d Cir.1990) (but rejecting RICO claim on behalf of depositors of failed bank). Further, business property is injured, within the meaning of § 1964(c), if the § 1962 misconduct of defendant causes delay, added expenses and inconvenience to the business's functions, *see Malley–Duff & Associates v. Crown Life Insurance Co.*, 792 F.2d 341, 355 (3d Cir.1986), *aff'd on other grounds*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); plaintiff has alleged such injury herein.

We must scrutinize the law applicable to the substantive violations of section 1962(a), (b) and (c) to determine whether plaintiff's pleadings, as augmented by the RICO Case Statement, pass muster for purposes of this Rule 12(b)(6) motion.

■■■■ First, under § 1962(a), it is illegal to use or invest income derived, directly or indirectly, from a pattern of racketeering activity "to acquire an interest in or to operate an enterprise which is engaged in interstate commerce." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232, 109 S.Ct. 2893, 2893, 106 L.Ed.2d 195 (1989). In the Third Circuit, however, a remedy may only be obtained for those injuries caused by the investment or use of racketeering income. *Glessner v. Kenny*, 952 F.2d 702, 708 (3d Cir.1991); *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir.1991). On the other hand, recovery is not warranted for injuries resulting from individual predicate acts or from a pattern of racketeering activity alone. *Brittingham*, 943 F.2d at 303–04; *Casper v. Paine Webber Group, Inc.*, 787 F.Supp. 1480, 1491 (D.N.J.1992). It is not enough to argue, under § 1962(a), that a defendant is a corporation that derives profits from racketeering activity, reinvests some of its profits into its business, and continues business by committing new racketeering acts against a plaintiff-victim, according to *Brittingham*, because that would eviscerate the distinction between § 1962(a) and § 1962(c). *Id.* at 305. The plaintiff in the present case does not articulate any cause of action under § 1962(a); its implicit claim that it is injured by San Clemente's use of funds derived from past frauds in order to fuel the solicitation of new frauds against plaintiff fails to state a claim on which relief can be granted under § 1962(a). Such a claim will be actionable under § 1962(c), however, if other requirements are also met, as discussed momentarily. Plaintiff's § 1962(a) claim, however, must be dismissed.

■■■ Similarly, plaintiff's § 1962(b) claim fails. Section 1962(b)) makes it unlawful "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in a contract of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Typically, such an injury is shown where "the owner of a [legitimate] enterprise infiltrated by the defendant as a result of racketeering activity is injured by the defendant's acquisition or control of [the] enterprise." *Casper v. Paine Webber Group*, 787 F.Supp. at 1494, citing *U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F.Supp. 1053, 1060 n. 12 (N.D.Cal.1991). In the present case, plaintiff fails to allege that it has suffered such an injury by being acquired or infiltrated by a defendant using racketeering proceeds. To the extent plaintiff seeks to assert a RICO claim arising from violation of § 1962(b), it will be dismissed.

Next we consider the sufficiency of plaintiff's pleading under § 1962(c), which states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The statute requires proof of five elements:

1) existence of an enterprise;

2) affecting interstate commerce;

3) by a person employed by or associated with the enterprise;

4) participation either directly or indirectly in the conduct of the affairs of the enterprise;

5) through a pattern of racketeering activity.

See *Rose v. Bartle*, 871 F.2d 331, 358 (3d Cir.1989).

Each of these elements has been sufficiently alleged, and only one requires any further discussion at this time. The argument that a defendant must conduct or participate in the conduct of such enterprise's affairs "through a pattern of racketeering activity" requires the pleading to allege a substantial nexus between the affairs of the enterprise and the pattern of racketeering activity. In other words, it is not sufficient when "the predicate acts are unrelated to the enterprise or the actor's association with it that the nexus element is missing, and consequently, there is no RICO violation." *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); see *Banks v. Wolk*, 918 F.2d 418 (3d Cir. 1990) (finding no nexus as to two alleged schemes). The RICO plaintiff must prove "continuity of racketeering activity, or its threat, *simpliciter*." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902.

The "pattern of racketeering activity" requires plaintiff to allege "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Gannon v. Continental Insurance Co.*, 920 F.Supp. 566 (D.N.J.1996), *quoting H.J. Inc.*, *supra*, 492 U.S. at 239, 109 S.Ct. at 2900. "Relatedness" is shown if the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics that are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901. The pattern requires continuity through a series of predicate acts committed over a substantial period of time, under the test of *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir.) (en banc), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). The *Tabas* court reiterated the teaching of *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36 (3d Cir. 1987), which set forth six factors to be used in determining whether a pattern of racketeering activity has been established in a given case, namely:

(1) the number of unlawful acts;

(2) the length of time over which the acts were committed;

(3) the similarity of the acts;

(4) the number of victims;

(5) the number of perpetrators; and

(6) the character of the unlawful activity.

*Tabas*, 47 F.3d at 1292. The Third Circuit's en banc opinion, however, did not actually apply the *"Barticheck* factors" in deciding the continuity question.

Open-ended continuity may be shown "when the commission of the predicate acts is 'a regular way of conducting defendant's ongoing legitimate business.'" *Tabas*, 47 F.3d at 1295, quoting *H.J. Inc*, 492 U.S. at 243, 109 S.Ct. at 2902. Thus, "if the predicate acts have been a regular way of conducting defendant's legitimate business over a long period in the past, the RICO pattern has been satisfied," as one way of satisfying the racketeering pattern. *Tabas*, 47 F.3d at 1295.

In the present case, such a pattern has been alleged in the Fourth Count of the Amended Complaint. Plaintiff alleges that San Clemente "is engaged in a continuous, ongoing and extended scheme to defraud banks and other institutions through a pattern of racketeering activity." (Amended Comp., Fourth Count, ¶ 2.) The alleged scheme consists of defendant's use of a sales force to make "thousands of cold calls to banks to find a single low-level employee/offi-

cer at a bank who can be induced into signing a so-called funds letter, purporting to obligate the bank to set up certificates of deposit for up to millions of dollars of brokered funds under circumstances where San Clemente knew or should have known that the person lacked authority to enter into the 'agreement.' Upon obtaining signatures on documents, San Clemente used that signature to extort money by threatening the bank with litigation in, or commencing suit in, California to try to force the bank to perform the alleged agreement containing terms which are unfavorable to the bank, or else force the bank to pay money to San Clemente in order to rescind the alleged agreements." RICO Case Statement ¶ 5(a). Because this scheme is alleged to involve multiple victims—identified in the RICO Case Statement at ¶ 4, and as may be further identified in discovery—and because the scheme of mail, wire and bank frauds is alleged to be an ongoing and continuing way of doing business, the pleadings meet the standard for open-ended continuity of a pattern of racketeering activity under § 1962(c).

We need not consider whether the RICO allegations alternatively meet the requirements for close-ended continuity. The predicate acts identified in the RICO Case Statement extend from at least February 4, 1994, (as to alleged victim Sterling Bank) to April 18, 1996 (as to plaintiff). While a pattern of predicate acts extending less than one year will not generally be recognized as sufficient for closed-ended continuity, see *Tabas*, 47 F.3d at 1293–94 (and cases cited therein), and conduct extending over "years" will be sufficient, *id.*, citing *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir.1991), conduct as alleged in the present case extending over at least 26 months involving multiple alleged victims would probably suffice to establish closed-ended continuity as well.

In summary, the pleading requirements of a RICO violation under § 1962(c) have been satisfied and defendant's motion to dismiss will be denied as to the § 1962(c) claim. The motion to dismiss will, however, be granted as to plaintiff's § 1962(a) & (b) claims. The accompanying order will be entered.

## C. Plaintiff's Appeals of Magistrate Judge Rosen's Orders

The Orders under review are non-dispositive Orders. This court has jurisdiction on these appeals from a Magistrate's decisions under Fed.R.Civ.P. 72(a) and District of New Jersey General Rule 40D.4(a), recodified as L. Civ. R. 72.1(c)(1) (eff. April 1, 1997). Under these Rules, the District Judge shall consider the appeal and set aside any portion of the Magistrate's Order found to be clearly erroneous or contrary to law. *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123, 1141 (D.N.J.1989); *Berel Co. v. Sencit F/G McKinley Associates*, 125 F.R.D. 100, 102 (D.N.J.1989); *Canadian Imperial Bank of Commerce v. Boardwalk Regency Corp.*, 108 F.R.D. 737, 739 (D.N.J.1986). A ruling is clearly erroneous when, "although there is evidence to support it, the reviewing Court is left with a definite and firm conviction that a mistake has been committed." *South Seas Catamaran, Inc. v. Motor Vessel Leeway*, 120 F.R.D. 17 (D.N.J.1988), *aff'd*, 993 F.2d 878 (3d Cir.1993). The court now turns to the merits of plaintiff's appeals.

### 1. Judge Rosen's Order of December 20, 1996

Plaintiff has appealed the decision of Judge Rosen which denies plaintiff's request for access to San Clemente's state and federal income tax returns the tax years 1990 to the present. Plaintiff argues that the returns are relevant to defendant's counterclaim for damages from alleged business loss as evidence of defendant's true financial condition before and after the transaction at issue in this lawsuit; the credibility of defendant's damages claim; and the accuracy of defendant's damages calculations allegedly based on past experience.

Defendants claim that all relevant information was contained in Financial Statements produced in conjunction with a previous order by the Court, and that Judge Rosen did not abuse his discretion in prohibiting the discovery of duplicative and irrelevant information contained in the tax returns in the absence of a showing of need by plaintiff.

A party's income tax returns, even if containing some relevant financial information, are protectable from discovery as confidential documents if the party seeking protection demonstrates good cause to uphold its expectation of confidentiality, as well as the availability of reliable financial information from other sources. The Third Circuit recognizes the public policy favoring non-disclosure of income tax returns as confidential communications between a taxpayer and the government. *DeMasi v. Weiss,* 669 F.2d 114, 119 (3d Cir.1982); *Troglione v. McIntyre Aviation, Inc.,* 60 F.R.D. 511 (W.D.Pa.1973); *Maldonado v. St. Croix Discount, Inc.,* 77 F.R.D. 501 (D.V.I.1978). Where the taxpayer has placed this financial information into dispute, the tax returns may contain relevant information. The probative value of such information must be weighed against the policy of confidentiality of tax return information, *id.; see also Fort Washington Resources, Inc. v. Tannen,* 153 F.R.D. 78, 80 (E.D.Pa.1994), taking into account the alternative sources from which reliable financial information may be obtained. *Id.; DeMasi, supra; Troglione, supra; Maldonado, supra.* Judge Rosen recognized these concepts in this case, he carefully weighed the parties' arguments, and he found that alternative sources of financial information were available from San Clemente, which he ordered produced. This was well within Judge Rosen's discretion and his determination is neither clearly erroneous nor contrary to law.

Judge Rosen considered plaintiff's request at a hearing on December 20, 1996, and, in his discretion, determined that the tax returns were not necessary—"like using a shotgun to kill a flea." (Transcript at 4:3–4). Judge Rosen expressed an intent to ensure that plaintiff received every bit of information relevant to defendant's counterclaim, but concluded that the tax returns would not show anything beyond the information already produced by defendant. (*Id.* at 8:16–18). He did, however, permit plaintiff to serve one Interrogatory and a document request concerning the method by which defendant calculated its counterclaim damages.

The court concludes that Judge Rosen was well within his discretion in denying plaintiff's motion to compel the production of defendant's income tax returns. Such a limitation upon the discovery of tax return information is not only supported by case law but is also well within the reasonable ambit of protective orders under Rule 26(c), Fed. R.Civ.P. A magistrate judge's decision in a non-dispositive discovery dispute will be set aside only if it is clearly erroneous or contrary to law. Rule 72(a), Fed.R.Civ.P.; L. Civ. R. 72.1(c)(1). There is particularly broad deference given to a magistrate judge's discovery rulings. *Toth v. Alice Pearl, Inc.,* 158 F.R.D. 47, 53 (D.N.J.1994); *Republic of Philippines v. Westinghouse Elec., Corp.,* 132 F.R.D. 384, 386–387 (D.N.J. 1990), *aff'd,* 949 F.2d 653 (3d Cir.1991) (noting broad discretion of magistrate judge in discovery matters). There has been no showing that Judge Rosen's ruling was clearly erroneous or an abuse of his broad discretion and thus plaintiff's motion pursuant to General Rule 40D (recodified as L. Civ. R. 72.1(c)(1), eff. April 1, 1997) will be denied and Judge Rosen's Order of December 20, 1996, is affirmed.

### 2. *Judge Rosen's Order of January 23, 1997*

In his order of January 23, 1997, Judge Rosen entered a four-page Order in response to plaintiff's second motion to compel discovery of certain funds letters from San Clemente which were made with or involving other financial institutions. In addition to the production of these funds letters, plaintiff sought an opportunity to contact the financial institutions that have previously dealt with San Clemente. Judge Rosen heard oral argument on December 20, 1996, revisiting this issue which had previously been raised and discussed by the parties. (Transcript at 11).

Judge Rosen recognized a need to balance the potential for harm to San Clemente's business and the need for discovery by F & M Bank. To accommodate these competing interests, Judge Rosen crafted a solution which limited the production of funds letters to those currently in the possession of San Clemente's counsel and placed certain restrictions on the ability of plaintiff to contact financial institutions. Namely, Judge Rosen's Order requires, inter alia, (1) that San

Clemente, through its attorneys, produce all funds letters in counsel's possession for inspection by counsel for F & M Bank; (2) that counsel for F & M Bank select ten (10) funds letters to be identified in a method mutually agreeable to counsel; (3) that counsel for F & M Bank has the option of directing telephonic inquiries to each of the third parties which/who executed the ten funds letters chosen by counsel as a result of the inspection; (4) that if counsel for F & M Bank elects to conduct such telephonic inquiries, counsel shall prepare an outline of questions to be presented, in writing, and forward that outline to counsel for San Clemente; (5) that counsel for San Clemente has the right to object to the questions to be presented; (6) that neither counsel nor any representative of F & M Bank communicate with any third-party named in any of the ten funds letters selected without the presence of counsel for San Clemente.

Plaintiffs now contend that Judge Rosen's remedy is unworkable because the funds letters in defense counsel's possession may not be a "truly random sample of the funds letters in existence" and because the presence of defense counsel during interviews with other financial institutions interferes with the work product of plaintiff's counsel and counsel's ability to interview potential witnesses.

The solution contemplated by Judge Rosen necessarily limits some of plaintiff's discovery opportunities in order to protect against possible harm to San Clemente that could result from plaintiff's unrestricted communication with former and present business associates of San Clemente. Plaintiff has failed to show, however, that Judge Rosen abused his discretion with respect to this discovery Order or the restrictions placed on F & M Bank. *Toth v. Alice Pearl, Inc, supra; Republic of Philippines, supra.* It is clear that Judge Rosen considered the concerns of both parties and worked with their attorneys to develop an arrangement that was fair to both parties. His Order reflects a reasonable discovery plan that is well within his discretion, because it is based upon a determination permitting a reasonable scope of discovery of defendant's commercial information involving customers not parties to this litigation while protecting against undue harm to defendant's

commercial relationships. Therefore, this court will not disturb Judge Rosen's Order of January 23, 1997, as it is not clearly erroneous or contrary to the law. If difficulties with this procedure develop in practice, or if matters discovered through this procedure lead to the need for further related discovery, I am confident plaintiff can ask for further assistance from Judge Rosen, including enlarging the scope of permitted discovery if good cause is shown within the time period for completing all discovery. Judge Rosen's Order of January 23, 1997, will therefore be affirmed.

### III. *Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment on defendant's counterclaim will be denied, defendants' motion to dismiss plaintiff's RICO claims will be granted in part and denied in part, and plaintiff's motions to appeal the December 20, 1996, and January 23, 1997, Orders of Magistrate Judge Rosen, will be denied.

The accompanying Order has been entered.

### ORDER

This matter having come before the court on plaintiff's motion for summary judgment on defendant's counterclaim, defendant's motion to dismiss Count Four of plaintiff's amended complaint, and plaintiff's motions to appeal the Orders of Magistrate Judge Rosen dated December 20, 1996, and January 23, 1997; and the court having reviewed the submissions of the parties; and for the reasons expressed in the Opinion of today's date;

It is this 25th day of June, 1997, hereby

ORDERED that plaintiff's motion for summary judgment pursuant to Rule 56, Fed. R.Civ.P., be and hereby is *DENIED*; and it is;

FURTHER ORDERED that defendant's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., be and hereby is *GRANTED* in part to dismiss plaintiff's claims in Count Four of the Amended Complaint arising under 18 U.S.C. §§ 1962(a) & (b), and is *DENIED* in part with respect to plaintiff's claim

therein arising under 18 U.S.C. § 1962(c); and it is

FURTHER ORDERED that plaintiff's appeal of Magistrate Judge Rosen's December 20, 1996 Order, pursuant to L. Civ. R. 72.1(c)(1), be and hereby is *DENIED*, and the Order is *AFFIRMED;* and it is

FURTHER ORDERED that plaintiff's appeal of Magistrate Judge Rosen's January 23, 1997 Order, pursuant to L. Civ. R. 72.1(c)(1), be and hereby is *DENIED*, and the Order is *AFFIRMED*.